## A95A1152. NORFOLK SOUTHERN RAILWAY COMPANY v. JONES.
### (466 SE2d 260)

McMURRAY, Presiding Judge.

Norfolk Southern Railway Company ("Norfolk Southern" or "the railroad") appeals from a judgment entered on a jury's verdict, awarding Andra Jones damages for work-related injuries he sustained at Norfolk Southern's rail yard in Atlanta, Georgia. The jury's verdict is based on a finding that Norfolk Southern violated the Federal Employers' Liability Act ("FELA"), 45 USC § 51 et seq. In a special verdict form, the jury segregated damages for past lost wages, future lost wages, past pain and suffering and future pain and suffering. The jurors also specified that they could not reach a verdict as to Jones' claim under the "Automatic Coupler" or Safety Appliances Act, 45 USC § 1 et seq. Other than challenging two evidentiary rulings and a jury instruction, Norfolk Southern contends the jury's $1,575,000 verdict was the product of vengeance, rather than proof, inspired by "pejorative" remarks against the railroad during Jones' closing argument. We affirm.

On February 23, 1991, Andra Jones was injured while working as a switchman for Norfolk Southern. The injury occurred while Jones

was manually aligning a railcar's "draw head" or "gooseneck" coupler, a 300 to 400 pound mechanism designed to automatically connect one railcar to another upon controlled impact. Although the coupler Jones was attending was intended to function without human intervention, the "draw head" skewed and would not properly engage. Jones attempted to correct the misalignment via manual manipulation, but failed because the coupler was not greased for easy adjustment. Jones was required to lift the massive coupler and push it into place. In the process, however, he injured his back. Jones reported the incident to his supervisor and submitted an accident report. This report later disappeared from Norfolk Southern's records and railroad supervisors speculated that Jones had faked a work-related accident.

The day after his injury, Jones was diagnosed with lower back strain. Jones returned to work a few days later with no restrictions, but acute pain set him in bed for hours after each day of work. A follow-up examination resulted in the same diagnosis. But this changed a month later after Jones consulted with a doctor not associated with Norfolk Southern. This physician determined that Jones had a ruptured disk and that he suffered nerve damage in his legs. Jones was instructed not to work, and directed to submit to physical therapy. Jones subsequently underwent a percutaneous lumbar diskectomy, in which a large needle was inserted in his back to remove a portion of the ruptured disk. Jones thereafter continued with physical therapy and returned to work. But Jones suffered with so much pain in his legs and back that he returned to the doctor. Further tests revealed that Jones still had a herniated disk. More spinal surgery was performed and physical therapy continued. Jones continued to experience tingling in his leg and he was informed that he has arthritis. Nonetheless, Jones returned to work in February 1993, but his pain forced him into a three-month work hardening program from which he received a list of restrictions. Norfolk Southern then evaluated Jones and decided he could no longer work as a switchman. It was determined that Jones has permanent scaring around his spinal cord and that he suffers with a 20 percent permanent disability. He was 31 years of age at the time of his injury.[1]

At trial, Jones claimed that Norfolk Southern violated the FELA and the "Automatic Coupler" or Safety Appliances Act by failing to routinely grease "gooseneck" couplers. Jones claimed that this main-

---

[1] In response to the dissent's charge that we inaccurately characterize "the evidence of Jones' future prospects[,]" we merely point out that on appeal an appellate court is bound to construe the evidence with every reasonable inference and presumption in favor of upholding the jury's verdict. *Mills v. State*, 137 Ga. App. 305 (1) (223 SE2d 498). Nothing more is acceptable upon appellate review, and we have recently affirmed this point in an FELA case where a railroad employee challenged a verdict in favor of the railroad. See *Neal v. CSX Transp.*, 213 Ga. App. 707, 709 (2) (445 SE2d 766).

tenance policy exposed him to unnecessary dangers associated with having to lift and pull the heavy "gooseneck" coupler under hazardous conditions. Norfolk Southern asserted at trial that such lubrication was neither required nor prescribed under the FELA or the Safety Appliances Act. Railroad supervisors testified that they believed Jones faked the work-related accident so that he could recover for an off-the-job injury. They also believed that Jones exaggerated the magnitude of his injuries by falsely demonstrating that he could no longer align a railroad switching device during a return-to-work test. After the close of evidence, however, Norfolk Southern's attorney admitted during closing argument that the railroad had failed to present evidence (as promised during opening statements) that Jones faked an on-the-job injury. Norfolk Southern's attorney also did not argue that Jones had faked a return-to-work test. He asserted that the only remaining issues were whether Jones caused his own injuries by negligently manipulating the "gooseneck" coupler and "whether [the railroad's policy not to grease gooseneck couplers] the way we've done it over a period of time is negligent or not."

Jones' attorney responded (during closing argument) by pointing out that Norfolk Southern failed to present proof supporting the railroad's long-held accusations that Jones is a fake, a liar and a cheat; that the accident report Jones submitted on the night of the accident was missing, and that the railroad's key witnesses (two Norfolk Southern foremen who inspected the "gooseneck" coupler on the night of the accident) gave dubious testimony regarding the extent of their inspection. Specifically, Jones' attorney questioned how the foremen could have possibly tested the lateral play in the "gooseneck" coupler in light of proof that such a test cannot be performed while a coupler is engaged and that the "gooseneck" coupler that caused Jones' injuries was engaged at the time of the alleged inspection. Along the same line, Jones' attorney pointed out noticeable differences in the handwriting on the foremens' inspection report indicating an alteration on a portion of the report providing that the "LATERAL PLAY" in the coupler was "OK." Jones' attorney suggested that these inconsistencies indicated that Norfolk Southern was involved in a cover-up and that the railroad routinely employed such draconian tactics to avoid liability under the FELA and the Safety Appliances Act. Jones' attorney also suggested that the Safety Appliances Act is ineffectual because it calls for the railroad to monitor itself; that it is against the railroad's interest to report violations under the Safety Appliances Act, and that, when issues of liability arise under the Safety Appliances Act, the railroad defends itself by accusing the injured worker of dishonesty or, alternatively, contributory negligence. Jones' attorney thus reasoned that the jury is the only reliable source for determining whether Norfolk Southern vio-

lated the Safety Appliances Act. He then concluded by asserting a systematic and logical argument relating to evidence of Jones' damages. Jones' attorney did not mention Norfolk Southern during the phase of his argument relating to Jones' claim for general damages, i.e., past and future pain and suffering.

After deliberating three hours and returning with specific questions regarding the Safety Appliances Act, the jury specified that "[w]e are divided" as to Norfolk Southern's liability under the Safety Appliances Act. The jury also specified that Norfolk Southern was "negligent under the Federal Employee Liability Act" and that Jones was not "contributory negligent." The jury then segregated damages, awarding Jones $110,000 for past lost wages, $665,000 for future lost wages, $200,000 for past pain and suffering, and $600,000 for future pain and suffering.[2]

1. Norfolk Southern contends the trial court erred in permitting Jones to inquire into the railroad's new policy (taken after Jones was injured) of lubricating "gooseneck" couplers. The railroad argues that Jones' attorney's question to the railroad's general foreman — "do you have to grease coupler carriers on cars that don't have goosenecks?" — violated the trial court's pretrial directive for Jones not to bring up the fact that "a year and a half later [the railroad] started lubricating all these things." We do not agree.

The objectional question was posed during the following examination: "[JONES' ATTORNEY:] Now, the goosenecks have longer shanks than do ordinary freight cars, don't they? [THE RAILROAD'S GENERAL FOREMAN:] That's right. Q. And I'm not saying anything about this, but this freight car right here wouldn't have a gooseneck, would it, this model if it was made right wouldn't have a gooseneck, would it? A. Not unless it was longer than fifty feet. Q. But a boxcar just never has a gooseneck unless it's longer than fifty feet, correct? A. That's right. Q. All right. And you wouldn't expect a gooseneck on any car that's fifty feet, would you? A. No, I wouldn't. Q. Now, are you required — do you have to grease coupler carriers on cars that don't have goosenecks? A. We grease them all now. Q. Well, but at the time this happened in 1991 did you have to grease those ones that didn't have goosenecks? A. We didn't grease anything."[3]

From this perspective, we cannot say that the question to which

---

[2] The railroad's attorney pointed out during closing argument that Andra Jones was not seeking medical expenses because these costs were already covered by insurance provided through Norfolk Southern. This assertion does not appear to be in dispute.

[3] The evidence at trial indicates that at the time of Jones' injury, Norfolk Southern used at least two types of couplers, short couplers and "gooseneck" couplers. The former were kept greased and the longer "goosenecks" were not. After Jones' injury, "gooseneck" couplers were greased. Of course, Jones' negligence claim is primarily premised on Norfolk Southern's failure to grease "gooseneck" couplers.

the railroad now objects was designed to elicit a response which was violative of the trial court's directive. On the contrary, it appears that the unresponsive answer by Norfolk Southern's general foreman — "[w]e grease them all now" — was the only cause for transgression of the trial court's pretrial directive not to bring up the fact that "a year and a half later [the railroad] started lubricating all these things." Moreover, inasmuch as the witness was hostile, Norfolk Southern's assertion that Jones embarked on this line of questioning knowing the witness would respond the way he did is speculative, at best.

2. Norfolk Southern contends the trial court erroneously excluded from evidence a video tape recording demonstrating the proper method of aligning a railway switching device similar to those Jones was required to operate.

The record shows that the video recording has two parts. The first segment depicts a grey-haired gentleman demonstrating the function of a railroad switching device, and the second segment depicts the entrance of a young woman. She is professionally clad, wearing heels, a silk suit and neat hair. This woman informs the grey-haired gentleman that she is the billing manager at the railroad's attorney's law firm; that her stature is five feet and one inch; that she weighs 117 pounds, and that she too can operate the switching device. After the older gentleman offers her a try, the young woman negotiates a rocky incline to the tracks, stoops with her back to the camera, jerks the switching device's large lever and successfully adjusts the tracks. The production ends after the woman turns, walks toward the video camera and giggles.

Jones' counsel objected to the tape's introduction into evidence, arguing (in part) that "they're basically trying to ridicule my client by bringing someone who appears fair, smaller, et cetera, to throw the switch. It's not the switch that they asked him to throw; that's in different conditions than they asked him to work in. That's one switch out of how many he may throw in a given time period." In opposition, Norfolk Southern's attorney argued that the demonstration was relevant to the railroad's claim that Jones faked a return-to-work test in which he could not properly align a railroad switch. The trial court excluded the video, ruling that the demonstration was prejudicial and that it is unrelated to the key issue of whether Jones was injured while aligning a "gooseneck" coupler. The railroad persisted, however, offering to show only the portion of the tape with the grey-haired gentleman. The trial court refused.

The admission or exclusion of a video tape demonstration is a matter of the trial court's discretion and will not be overturned unless abused. *CSX Transp. v. McCord*, 202 Ga. App. 365, 368 (5) (414 SE2d 508); *Adams v. Southern R. Co.*, 180 Ga. App. 578 (349 SE2d 809). See *Woods v. State*, 210 Ga. App. 172, 173 (2), 174 (435 SE2d

464). In light of the circumstances of the video taped demonstration in the case sub judice, as well as Norfolk Southern's apparent abandonment (during closing argument) of its claim that Jones was exaggerating his injuries, we find no abuse of discretion or harm in the trial court's ruling not to admit the video tape recording into evidence. This enumeration is without merit.

3. Norfolk Southern contends the trial court erred in charging the jury that it must apply a below market discount rate to calculate the present value of Jones' future lost earnings. The railroad also contends the evidence failed to support the method of calculation the jury was instructed to use. We disagree on both grounds.

In FELA actions, "[i]t is . . . permissible for the [trial] judge to recommend to the jury one or more methods of calculating [the] present value [of future lost earnings] so long as the judge does not in effect pre-empt the jury's function." *Monessen Southwestern R. Co. v. Morgan*, 486 U. S. 330, 342 (108 SC 1837, 100 LE2d 349). The trial court's instruction in the case sub judice with regard to the method for discounting any award for future lost earnings does not require the application of a specific discount rate, impose rigid mathematical limitations on the calculation of any future lost wages, or remove an essentially factual question from the jury's purview. The charge included a description of the components of future lost wages, an explanation of factors that may increase or decrease the value of these elements and a general directive that any "lump sum" award for future lost income must be discounted to reflect present value. The method of discounting was described as "a below market discount rate which represents the estimated market interest rate the award would be expected to earn over the period of loss, adjusted for the effects of any income tax from interest so earned and then reduced by an estimated rate of future price inflation." This directive did not preempt the jury's function in calculating future lost wages. Compare *Monessen Southwestern R. Co. v. Morgan*, 486 U. S. 330, 340-342, supra. Further, the evidence from Jones' economic expert fully supports the instruction. His description of the method of calculating present value, as the market interest rate reduced by inflation, is substantially similar to the above instruction.

4. Norfolk Southern contends the trial court erred in denying its motion for mistrial based on allegedly improper comments during closing argument which resulted in a punitive damages award. Specifically, the railroad argues that Jones' attorney employed "pejorative" arguments against the railroad which inspired the jury to send a message to the railroad via an excessive verdict. We do not agree.

"[I]n determining whether a trial court abuses its discretion in refusing to order a new trial on the issue of damages in an FELA case, 'the appellate court must make its own "detailed appraisal of the evi-

dence bearing on damages." *Grunenthal v. Long Island Rail Road Co.,* 393 U. S. 156, 159 (89 SC 331, 333, 21 LE2d 309) (1968).' *Nairn v. National Rd. Passenger Corp.,* [837 F2d 565, 567 (1988)]." *Central of Ga. R. Co. v. Swindle,* 260 Ga. 685, 686 (398 SE2d 365). A detailed examination of the evidence bearing on damages in the case sub judice does not demand a judicial finding that the jury's $110,000 award for past lost wages, $665,000 award for future lost wages, $200,000 award for past pain and suffering and $600,000 award for future pain and suffering are " 'so excessive . . . as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial. . . . (Cits.)' *Lane v. Gorman,* [347 F2d 332, 335 (1965)]." *Seaboard System R. v. Taylor,* 176 Ga. App. 847, 849 (2) (338 SE2d 23). On the contrary, we observe factors that authorize a finding that the jury was not motivated by hatred or passion against Norfolk Southern. And when read in proper context, we do not believe the "pejorative" remarks cited in the dissenting opinion were uttered with insidious intent, but were within the range of permissible closing argument.

(a) The Standard of Review. It is true that " 'damages recoverable under the FELA on account of a railroad employee suffering injury or death on the job are compensatory only and that punitive damages are not recoverable. (Cit.) However, the jury's determination of the amount of damages to be awarded is otherwise inviolate, "absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible· inference that passion, prejudice or another improper cause invaded the trial. . . . (Cits.)" *Lane v. Gorman,* 347 F2d 332, 335 (10th Cir. 1965). This standard of review is consistent with that which obtains under Georgia law, which has been stated as follows: "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear '(exorbitant),' 'flagrantly outrageous,' and 'extravagant.' 'It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush.' It must carry its death warrant upon its face." (Cits.)' *Seaboard System R. v. Taylor,* 176 Ga. App. 847, 849 (2)[, supra]." *CSX Transp. v. Darling,* 189 Ga. App. 719, 721 (1) (377 SE2d 217). In the case sub judice, Norfolk Southern urges this Court to discard these well established maxims via primary reference to *Central of Ga. R. Co. v. Swindle,* 260 Ga. 685, supra, where the Supreme Court set aside a general verdict because of exceptional circumstances signifying that the jury's award was motivated by passion, rather than proof of loss. Id. at 686.

Although *Swindle* and the case sub judice are similar in that both involve review of FELA verdicts that are beyond quantitative justification, the similarities end there. In *Swindle,* the Supreme

Court concluded that the jury's $875,000 general damage award was motivated by passion (roused via "pejorative" comments against the railroad during closing argument) because (1) the verdict was more than 14 times greater than the plaintiff's medical expenses and lost wages of $59,308.82; (2) the plaintiff suffered no occupational disability; and (3) there was no proof that the plaintiff suffered permanent debilitating injuries. In contrast, the jury's $800,000 award in the case sub judice for past and future pain and suffering is within $25,000 of the jury's total award for lost wages ($775,000), and is over $50,000 less than the highest amount of special damages Jones tendered into evidence at trial.[4] Also unlike *Swindle*, there is evidence in the case sub judice that Jones suffers permanent occupational and recreational disabilities; that Jones' injuries caused him excruciating pain during rehabilitation, and that permanent scaring around Jones' spinal cord will result in periodic, progressive and debilitating back pain for the rest of his natural life, projected at over 40 years. And while this evidence sounds poignant differences between *Swindle* and the case sub judice, the most striking evidentiary distinction is that Jones is not prepared or qualified, as was the plaintiff in *Swindle*, to absorb the harsh personal, social and economic consequences of his injury.

There is evidence that Jones, once a professional football hopeful, is not educationally advanced or skilled; that his only advantage was a unique physical prowess and that this talent is now gone.[5] This proof, and evidence that Jones is now only qualified or able to perform unskilled and low-paying clerical work, would authorize a finding that Jones will never be able to pick up his life where he left off before his injury and that Jones is now relegated to a personal, social and economic posture that he never envisioned. As a reviewing court, we must presume that such legitimate factors contributed to the jury's $800,000 award for past and future pain and suffering. See *Realty Bond & Mtg. Co. v. Harley*, 19 Ga. App. 186, 187 (2), 189 (91 SE

---

[4] The jury's awards for past and future lost wages are within the range of evidence adduced at trial. Jones was injured on February 23, 1991, and trial concluded on November 10, 1994. Jones earned $31,384 in 1988, $26,937 in 1989, $34,209 in 1990, $14,061 in 1991, $244 in 1992 and $463 in 1993. Jones' economics expert calculated past lost wages at $106,294 in after-tax dollars, using the 1990 earnings and offsetting the amounts earned after the injury. This expert used 1990 earnings to project the present value of Jones' after-tax lost future earnings. He took the average yield on a three-year government bond since 1954 and compared it with inflation to get an adjusted real interest rate or discount rate of 2.2 percent. He also considered the cost of replacement insurance and Jones' possible future earnings in light of a vocational rehabilitation expert's testimony, predicting amounts Jones could earn in the future. The economist testified that, assuming Jones could earn between $16,567 and $21,500 per year, with a work-life expectancy of 24.95 years, the present value of his future lost income was $690,542 to $745,443. Norfolk Southern's economist calculated the present value of Jones' lost future earnings at $429,412, using a higher discount rate.

[5] Although Jones attended college and was involved there in athletics, he did not obtain a degree because he failed to pass a standard academic examination required for graduation.

254). Accordingly, we cannot say (as a matter of law) that the jury's general damage awards, totaling $800,000 for past and future pain and suffering, are excessive and can only be explained logically as having resulted from an improper cause. Indeed, contrary to the dissent's view, we observe factors indicating that the jury was a pensive group, intent on resolving the issues of damage (as well as liability) according to the evidence adduced at trial and the trial court's instructions. Specifically, the jury returned a special verdict, rather than a general verdict, segregating *past* pain and suffering ($200,000) from *future* pain and suffering ($600,000); the jury's awards for past lost wages ($110,000) and projected lost wages ($665,000) are well within the range of proof tendered at trial; the jurors deliberated for over three hours before reaching a verdict; they asked several questions during deliberations regarding Norfolk Southern's liability under the "Automatic Coupler" or Safety Appliances Act and they stated in a special verdict form that they are "divided" on the issue of Norfolk Southern's liability under the Safety Appliances Act.

(b) "Pejorative Remarks" and Closing Argument. Although "pejorative" argument has been a basis for questioning general damage awards in FELA cases, *CSX Transp. v. Levant*, 262 Ga. 313, 314 (1) (417 SE2d 320); *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685, supra, belittling portrayal of an opposing party during closing argument has been endorsed when such oratory relates to issues that are properly before the jury. *Miller v. Coleman*, 213 Ga. 125, 129 (6), 130 (97 SE2d 313). The law only forbids the introduction of facts, by way of argument, that are not in the record and are calculated to prejudice the opposite party. Id.

In the case sub judice, the "pejorative" arguments cited in the dissenting opinion do not inject facts in the record as was the case in *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685, 687, n. 1, supra. On the contrary, our reading of the trial transcript reveals that the comments quoted in the dissenting opinion relate to issues that were properly before the jury. We, therefore, do not believe Jones' attorney stepped outside the scope of permissible closing argument.

The First "Pejorative" Argument. The first quotation in the dissenting opinion regarding a "pejorative" argument by Jones' attorney — "these people haven't learned a lesson. Nothing has been taught to them about how to run a railroad or how to treat human beings" — is addressed to Norfolk Southern's defense that Jones is the sole proximate cause of his injury, and follows argument relating to the railroad's claim that Jones lied about the incident which caused his injury. Jones' premise appears to be that Norfolk Southern resorted to draconian tactics to avoid responsibility under the Safety Appliances Act, 45 USC § 1 et seq.

Norfolk Southern's liability under the Safety Appliances Act was

an issue at trial and, to this extent, there is proof that Norfolk Southern supervisors circulated baseless rumors that Jones faked his work-related accident. Under these circumstances, and in view of evidence indicating that documents relating to the railroad's compliance with the Safety Appliances Act may have been altered to cover-up the condition of the "gooseneck" coupler that caused Jones' injuries, we believe the first "pejorative" argument quoted in the dissenting opinion is within the range of permissible closing argument.

The Second "Pejorative" Argument. The phrase — "what it boils down to is Andra just doesn't matter to them" — relates to an argument concerning proof that a pertinent document had been altered without Jones' approval. Under these circumstances, we believe it was permissible for Jones' attorney to argue that Jones' objections to such alterations "just doesn't matter to them."

The Third "Pejorative" Argument. The final "pejorative" phrase quoted by the dissent — "they've [Norfolk Southern's] got to hear it from you" — relates to a comment regarding the jury's role in resolving the question of whether greasing "gooseneck" couplers is required under the Safety Appliances Act. The full context of this phrase is as follows: "If [Norfolk Southern] called you on the phone at night, look, what did we do wrong, you'd say well, grease those coupler carriers. . . . I mean, but you know, they've got to hear it from you."

We do not view the above logic as an attempt to inject prejudice against Norfolk Southern. On the contrary, the argument appears to be an accurate characterization of the jury's role in resolving a prime issue of liability, i.e., whether Norfolk Southern was in compliance with the Safety Appliances Act.

(c) The Nature of Jones' Closing Argument. Jones' attorney's closing statement logically divides arguments relating to liability from arguments relating to damages. Specifically, after debating liability, Jones' attorney went through each item of damage specified on the special verdict form and suggested means by which the jury may calculate damages. He did not then, nor (in our view) at any phase during closing argument, unduly belittle Norfolk Southern or attempt to rouse baseless fury against the railroad.[6] On the contrary, Jones' at-

---

[6] While Jones' attorney strongly criticized Norfolk Southern for purportedly attempting to avoid liability under the FELA and the Safety Appliances Act via use of draconian tactics, we cannot say that his arguments were irrelevant, unsupported by evidence and designed solely to inflame passion against the railroad. The railroad's compliance with the FELA and the Safety Appliances Act were critical issues at trial and so were the railroad's defenses of contributory negligence and (until closing argument) fraud by Jones. Weighing against the railroad's claims, however, and supporting Jones' theory that the railroad would resort to sordid tactics to avoid liability is Norfolk Southern's admission (during closing argument) that its supervisors circulated baseless rumors against Jones, evidence that a railroad supervisor did not testify candidly about offering Jones an alternative clerical job; evidence that a report submitted to the railroad by Jones on the night of the accident disappeared, and evi-

torney admonished the jury during the damages phase of his closing argument to return a verdict in accordance with the evidence adduced at trial and in compliance with the trial court's instructions regarding the appropriate measure of damages. In fact, during his specific argument relating to past and future pain and suffering, Jones' attorney did not even mention Norfolk Southern. He asserted the following: "Finally, the element of pain and suffering, past and future, will be on your verdict form. We submit that should be a substantial award in this case. Not based on how you would feel if your back was operated on or how I would feel, not based on what you know about somebody, but what you think Mr. Andra Jones' experience is. I'm going to tell you something, folks. Some of us have lots of talent that we can do things with. I never could have tried out for pro football. I don't think they'd let me carry the ice bucket, but some people who've got great physical ability pride themselves on that and that's kind of what they think is important.

"In the language of the doctor that the railroad sent [Jones] to, he's lost twenty percent of what he was. What you think he's lost is up to you. What Andra has lost in terms of pain and suffering is a permanent partial disability, that is, not just the work life expectancy, but for each day of his life he will have that limitation. But that doesn't mean he's going to get up feeling like he's got to reach for a cane or advil every day. But what it does mean is that he doesn't take steps like he could, he can't play sports like he could, he's not going to play rugby any more, you're going to catch him out there shooting hoops. He is not going to be the kind of person who is going to do anything that's going to risk his back, not now, not ever. That's a heck of a price to pay. That is not something that anybody wants to volunteer to give up.

"Now, all of us want to have good health and all of us know folks who don't. But nobody should have it taken away from them. And I want to ask you to give something reasonable and fair as compensation for that, but what you give for that is up to you. We submit it ought to be in the range in what you give for other elements of damage. You decide. But I'll tell you it ought to be something significant. It ought to be something you address and think about. Okay?

"The pain and suffering part is something he'll always have. It doesn't matter where he is or what he's doing, some amount of that will be with him. I'm going to leave it up to you. The judge will say your enlightened conscience. That's actually the test for what's appropriate for general damages, anxiety, worry, the shock, noise, those

---

dence raising doubt as to the reliability of the railroad's Safety Appliances Act report that the lateral play in the "gooseneck" coupler was "OK" on the night Jones was injured.

kind of physical changes. Having surgery on your back a few times having a different back. That is left up to the enlightened conscience of fair and impartial jurors in the language that's going to be given by the court."

The trial court did not err in denying Norfolk Southern's motion for a mistrial.

*Judgment affirmed. Pope, P. J., Johnson, Blackburn and Ruffin, JJ., concur. Beasley, C. J., Birdsong, P. J., and Smith, J., concur in judgment only. Andrews, J., dissents.*

ANDREWS, Judge, dissenting.

I respectfully dissent because the $800,000 award for past and future pain and suffering is excessive and can only be explained logically as having resulted from an improper cause.

The majority mischaracterizes the evidence of Jones' future prospects. Although the evidence showed that Jones suffered pain after his injury and consequent to his two surgical procedures, an orthopedic surgeon evaluated Jones' permanent disability at 20 percent. Medical records from before the laminectomy indicated that Jones complained of pain while playing basketball and volleyball. Records from after the laminectomy show that the only abnormality observed was some limitation in Jones' ability to raise his leg while straight, characterized as not severe. In addition, a consulting physician found nothing objective to substantiate Jones' complaints of pain. It is undisputed that Jones can perform at least sedentary to light work. Jones did well in school, attended college on a full football scholarship, finished all his course work, and majored in business administration, but did not graduate because he failed the Regent's test the only time he took it. Although he presently works without pay as a clerk for his wife's automotive body shop, the employee who formerly held this job was paid $21,000 per year. The majority's conclusion that Jones' only advantage was his (now lost) unique physical prowess belittles his other talents. Although, undoubtedly, Jones is entitled to some compensation for past and future pain and suffering, the evidence does not support an award for the amount he received.

I believe Jones' counsel's attempts to vilify Norfolk Southern as an entity unconcerned with its employees' well-being, dignity, or sense of self-worth account for this disparity between the evidence and the award. In closing, counsel argued "these people haven't learned a lesson. Nothing has been taught to them about how to run a railroad or how to treat human beings." Later, he stated "what it boils down to is Andra just doesn't matter to them." In the context of greasing the coupler carriers which were at issue in the unsuccessful Safety Appliances Act claim, counsel also argued that "they've [Norfolk Southern] got to hear it from you."

The Supreme Court found that similar pejorative arguments in a FELA case suggested that the verdict was rendered at least in part with a punitive intent. *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685, 687 (398 SE2d 365) (1990). Because punitive damages are not recoverable in FELA cases, counsel's arguments were improper. Id.

DECIDED DECEMBER 5, 1995 —
RECONSIDERATION DENIED DECEMBER 20, 1995 —

*Branch, Pike & Ganz, Thomas B. Branch III, Tanya M. Lawson*, for appellant.
*Blackwood & Matthews, B. Randall Blackwood, John D. Steel*, for appellee.