A98A0250. CENTRAL OF GEORGIA RAILROAD COMPANY
v. MOCK.
(499 SE2d 673)

JOHNSON, Judge.

Ronald Mock was employed by Central of Georgia Railroad Company ("Central") as a railroad conductor. He sued Central pursuant to the Federal Employers' Liability Act ("FELA") for injuries received while employed by Central. A jury returned a verdict in favor of Mock, and Central appeals. For reasons which follow, we affirm.

The record shows that on September 27, 1991, Mock attempted to remove the end-of-train ("EOT") device while the train was stopped in a joint yard of CSX Transportation and Central. An EOT consists of a body, an 18- to 24-inch stem, an air hose, and an air hose coupling device called a "gladhand." It weighs approximately 35 pounds. According to Mock, the EOT was "stuck" in the car, but he jarred it loose. Mock removed the EOT, raised it to a certain height above his head, then let the EOT go with his right hand, balancing one end with his left hand, while grabbing the air hose with his right hand. Two other conductors verified that an individual must balance the EOT with one hand while reaching for the air hose with the other hand. Footing is important because the conductor must pivot and turn to the side in performing this task.

Mock testified that the ground was muddy in the track area where he had to work. It had rained nearly three inches at the site two days before Mock was injured, and the track area was "like a mud pond." It usually stayed muddy and "very slick" for three or four days after a rain and had been that way since Mock began work for Central in 1977. Weeds and vegetation in an adjacent ditch next to the railroad tracks partially plugged the culvert. The two railroads

that jointly used the yard argued about which should maintain it and how much should be spent on maintenance, so "very little got done." Requests by train employees for drainage rocks went unheeded.

As Mock attempted the balancing maneuver, he lost his footing. He held onto the EOT in an effort to keep from damaging the device, and in so doing, he injured his left shoulder. The railroad brakeman helped Mock put his shoulder back into its socket, and Mock finished the trip. Mock reported his injury to the radio dispatcher and, when he arrived at his destination, informed his supervisor that he had hurt his shoulder. He also spoke to a claims agent the day he left the hospital, while on medication, and informed the agent he was having problems remembering what happened. Mock first mentioned the mud and his loss of footing during a pre-trial deposition.

1. In its first enumeration of error, Central asserts the trial court erred in refusing to grant its motion for directed verdict on Mock's claim for recovery under the drainage regulation. The regulation at issue provides: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed must be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 CFR § 213.33. Central contends Mock failed to prove the ditch would not accommodate expected water flow, that the ditch was immediately adjacent to the roadbed, or that the ditch was the cause of the mud on which he slipped. Without citing any relevant authority to support its argument, Central maintains that expert testimony is required to establish when a drainage and/or other water-carrying facility is sufficiently "maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." We disagree.

"In a FELA case, a directed verdict is possible only when there is a *complete absence* of probative facts supporting the nonmovant's position." (Citation and punctuation omitted; emphasis in original.) *Bagley v. CSX Transp.*, 219 Ga. App. 544, 546 (1) (465 SE2d 706) (1995). Thus, the question before us is whether there was a complete absence of probative facts supporting Mock's claim against Central under the drainage regulation.

Mock testified that the culvert was partially obstructed at the time of his injury in the same fashion as shown in his exhibits. The railroad individual who was responsible for maintaining the area under the bridge admitted that weeds covered up the ditch immediately adjacent to the track "[a] little bit." According to witnesses, the ditch was "just off the outside" of the track, had always been muddy and slick when it rained, and never drained properly. In addition, Mock presented testimony that there was no ballast between the rails and that Central refused to provide gravel which was requested by the employees in an attempt to rectify the drainage problem. This

testimony provides probative facts supporting Mock's position, and the trial court did not err in refusing to grant Central's motion for directed verdict on this ground. This is not a design defect case, and the fact that Central provided testimony from an expert witness and Mock did not merely goes to the weight of the evidence and is a consideration for the jury, not the appellate court.

2. Central maintains the trial court erred in giving Mock's requested charge concerning the applicability of the federal Safety Appliance Act ("SAA"). 49 USCS § 20301 et seq. If a violation of the SAA results in injury to a railroad employee, the negligence of the employee is not relevant and does not reduce his recovery unless his negligence can be said to be the sole cause of his injury. See 45 USCS § 53. According to Central, the SAA was not applicable in this case because there were no allegations that any of the appliances covered by the SAA caused Mock's injury. According to Mock, the drainage regulation (49 CFR § 213.33) is a Federal Safety Appliance standard. While Central admits that the violation of certain railroad safety regulations has been given the same effect as a violation of the SAA, namely the annulling of the employee's negligence unless it is the sole cause of the injury, Central argues that a violation of the drainage regulation does not have that result because this regulation was not enacted for the safety of railroad employees and therefore is not comparable. We disagree.

Under 45 USCS § 431, the Secretary of Transportation has the authority to issue appropriate regulations relating to "all areas of railroad safety[,] supplementing provisions of law and regulations in effect on [October 16, 1970]." The drainage regulation was promulgated by the Secretary of Transportation pursuant to this authority and is part of a group of regulations referred to as "Track Safety Standards." See 49 CFR § 213. It is well established that in certain circumstances, regulations enacted by the Secretary of Transportation have the same force and effect as the SAA, i.e., nullifying an employee's contributory negligence. 45 USCS § 437 (c). See *Kernan v. American Dredging Co.*, 355 U. S. 426 (78 SC 394, 2 LE2d 382) (1958); *Eckert v. Aliquippa & Southern R. Co.*, 828 F2d 183 (3rd Cir. 1987). In fact, at least one court has held that "a trial court commits reversible error by failing to submit an SAA claim to the jury when a provision of the Act has been violated through a violation of a regulation promulgated thereunder. [Cit.]" Id. at 185.

Congressional intent to afford injured railroad employees a remedy against their railroad employers is strong. Thus, we agree that a violation of a regulation promulgated under the SAA constitutes a violation of the SAA. See *Eckert,* supra; *Beissel v. Pittsburgh & Lake Erie R. Co.*, 801 F2d 143 (3rd Cir. 1986), cert. denied, 479 U. S. 1088 (107 SC 1296, 94 LE2d 152) (1987). See also *Orchelle v. CSX Transp.*,

574 S2d 749, 753 (2) (Ala. 1990) (evidence of a violation of 49 CFR § 232.17 (b) (1), regarding the maintenance of brake equipment on cars, was sufficient to warrant a jury charge on the SAA). "[T]he violation of the regulations constitute[s] a violation of the statutory duty as defined by the Secretary of Transportation pursuant to his rulemaking authority under the SAA. [Cit.]" *Eckert,* supra at n. 4. Since the Track Safety Standards are designed at least in part to protect employees, they are covered by the SAA. Contrary to Central's argument, the SAA does *not* merely cover appliances.

Moreover, although there are apparently no cases on point, it is evident from the standpoint of both legislative intent and prior judicial interpretation that the drainage regulation was enacted to both promote track stability *and* provide a safe working environment for railroad employees. See, e.g., *Black v. Baltimore & Ohio R. Co.,* 398 NE2d 1361 (Ind. App. 1980) (complaint seeking Public Service Commission to order railroad to institute program to correct hazard created by muddy condition in which trainmen were required to work was preempted by virtue of provisions of the Federal Railroad Safety Act and corresponding federal regulations). Accordingly, the trial court did not err in charging the jury on the SAA.

3. Central next asserts the trial court erred in refusing to give its requested charges concerning Mock's duty to exercise ordinary care, when Central asserted a contributory negligence defense. "[S]imply because a request to charge is apt, correct and pertinent, it is not necessarily error to fail to charge it. The test is whether the court substantially covered the principles embodied therein or whether it was sufficiently or substantially covered by the general charge." (Citation and punctuation omitted.) *Monroe v. Southern R. Co.,* 210 Ga. App. 597, 598 (2) (436 SE2d 568) (1993). In its charge, the trial court discussed negligence, foreseeability, causation, contributory negligence, the effect of contributory negligence on the recovery, the fact that Mock had to prove negligence before Central was required to prove contributory negligence, and the fact that there must be a causal relationship between Mock's negligence and his injury. The trial court's charge sufficiently and substantially covered the principles of contributory negligence. Thus, the trial court did not err in refusing to give Central's requested charges based on the defense of contributory negligence.

4. Central contends the trial court erred in refusing to give the following charge: "You are instructed that if the plaintiff had a choice of ways of doing a particular job in the course of his employment, one way involving danger and risk of injury to himself and another way that is safe or less dangerous, and he voluntarily chooses the unsafe or more dangerous way, then the employee may be deemed negligent, if the risk of injury was obvious and such as a man of ordinary pru-

dence would have avoided." We find no error in the trial court's refusal to give this charge.

Mock testified that the EOT was "stuck" in the car, but he jarred it loose. He then removed the EOT, raised it to a certain height above his head, and let the EOT go with his right hand, balancing one end with his left hand, while grabbing the air hose with his right hand. Two other conductors verified that an individual must balance the EOT with one hand while reaching for the air hose with the other hand. According to one conductor, "you've got to grab that hose because it'll be dangling like that, and once it hits you on the knee, you'll — you'll grab it from then on, because it hurts." While Central presented evidence of an alternative way to remove the EOT, there was no evidence that Mock knew of the alternative method.

5. The trial court did not err in refusing to give Central's requested charge that "damages in an FELA case should not be a windfall to a plaintiff or punishment to a railroad." While Central correctly notes that punitive damages are not authorized in an FELA action, such a charge was not mandated in the present case. There was no evidence presented that Mock or his attorneys desired to punish Central or to obtain a windfall. Mock merely presented evidence of his lost wages, impairment of his future earning capacity, his permanent physical impairment, and his pain and suffering.

6. The trial court did not err in refusing to give Central's requested charge that speculative damages and damages based on "future possibilities" were not recoverable. The jury charge given by the trial court substantially and sufficiently covered this principle. During the portion of the charge relating to damages, the court repeatedly informed the jury that it could award damages only for past and future lost wages and benefits and for past and future pain and suffering which Mock was "reasonably certain" to suffer in the future, to lose, to have earned, and so forth. We find no error.

7. Central contends the trial court erred in failing to charge the jury that "[t]he same causation standard — whether the act contributed in any way to the injury — applies both to defendant's negligence and plaintiff's contributory negligence." Once again, this charge was substantially and sufficiently covered in the jury charge given by the trial court. As discussed in Division 3, the trial court exhaustively covered the principles of negligence, burdens of proof, causation, and contributory negligence. The trial court charged the jury that "[n]egligence simply means the absence of or failure to exercise the degree of care required by law to be exercised." The trial court further charged the jury that "if the plaintiff himself was legally partially responsible for the incident which caused his injury, then you would diminish the amount of damages that you otherwise would have awarded in proportion to the amount of negligence that

you attribute to the plaintiff, if you find him negligent, whatever you may find that to be from the evidence itself."

*Hickox v. Seaboard System R.*, 183 Ga. App. 330 (358 SE2d 889) (1987), does not stand for the proposition that the requested jury charge *must* be given. Rather, *Hickox* merely holds that the FELA cases which allow plaintiffs to reach the jury on a slim showing of negligence also permit defendants to reach the jury on the issue of the plaintiff's negligence with an equally slim showing. In the present case, the issue of Mock's contributory negligence was permitted to go to the jury, and the trial court charged the jury on this issue. This enumeration lacks merit.

8. Central argues the trial court erred in refusing to give Central's request to charge and in giving Mock's request to charge regarding the effect of income taxes on any award to Mock. The jury was instructed regarding reducing any damage award for future lost earnings to their present value and charged that "any amounts that you allow for damages shall not be subject, incidentally, to income tax; therefore, you should neither add nor subtract for income tax when arriving at your verdict." Central objects to the second portion of this charge, contending it was incorrect and prejudicial. According to Central, *Norfolk & Western R. Co. v. Liepelt*, 444 U. S. 490 (100 SC 755, 62 LE2d 689) (1980), requires that income taxes be subtracted in arriving at the award, whereas the trial court's charge prohibits subtraction. We disagree with Central's interpretation of *Liepelt*.

*Liepelt* does not *require* that income taxes be subtracted in arriving at an award. *Liepelt* acknowledges that a plaintiff's after-tax income, rather than his gross income before taxes, provides the only realistic measure of his ability to support his family. Id. at 493. Without a charge informing the jury that its award will not be subject to income taxes, it is entirely possible that a jury would inflate the award and overcompensate the plaintiff on the basis of the erroneous assumption that the judgment will be taxable. Thus, *Liepelt* holds that it is error to refuse a requested instruction that the jury's award of damages would not be subject to income taxation. Giving this charge negates the necessity of subtracting income taxes from any award of past or future lost wages since the jury is instructed that its award will not be taxed. Accordingly, the trial court did not err in giving Mock's requested charge and in refusing to give Central's requested charge.

9. The trial court did not err in refusing to grant Central's motion for directed verdict on Mock's FELA claim. Contrary to Central's assertion, the evidence did not show that Mock's own negligence was the sole cause of his injuries. As previously stated, in a FELA case, a directed verdict is possible only when there is a complete absence of probative facts supporting the nonmovant's position.

*Bagley*, supra. Thus, the question before us is whether there was a complete absence of probative facts supporting Mock's FELA claim against Central.

A review of the record reveals some evidence that Central violated the drainage regulation. There is further evidence that the EOT was awkward and hard to control, that Mock had to use one hand to balance the EOT while grabbing the air hose with his free hand, and that Mock and other conductors received no training regarding the removal of EOT devices. This evidence is sufficient to enable a rational trier of fact to determine that Central failed to provide a safe working environment for Mock.

Furthermore, we do not find that Mock's testimony should be construed against him. While Mock did not mention the presence of mud when first questioned by the claims agent, Mock explained that he was under medication at the time and that his focus was on his injury, rather than the conditions under which he was working at the time of the injury. It is further undisputed that Mock was never directly asked about the conditions surrounding the incident or mud until his pre-trial deposition, when he was asked where he was standing at the time of the incident. Thus, this case is not controlled by *Shiver v. Norfolk-Southern R. Co.*, 225 Ga. App. 544, 545 (1) (484 SE2d 503) (1997), where the plaintiff made an extensive statement which was totally contradicted by his later testimony. The trial court correctly denied Central's motion for directed verdict on this issue.

10. Central next asserts the trial court erred in refusing to grant a directed verdict on Mock's claim for future lost wages. Central claims Mock failed to sustain his burden of proving future damages with reasonable certainty. We disagree.

Evidence presented showed that Mock suffered a 40 percent physical impairment of his shoulder, which translated into a 24 percent physical impairment of his whole person. Mock is permanently restricted from hanging from a moving train, pushing or pulling more than 30 pounds, and lifting more than 35 pounds. He has persistent pain and is disqualified from his conductor's work. Because of this, he lost 16.5 years of seniority and is now subject to any possible layoffs. While Mock is currently employed as an engineer with Central and is making more money than he did as a conductor, Mock testified that this job sometimes causes his left arm to hurt and he has to complete tasks using only his right arm. He further testified that he loses $600 to $700 in wages per month because he needs to rest his shoulder from all the activity. In addition, an economist testified as to Mock's lost future income based on his 24 percent impairment. This evidence was sufficient to permit the jury to determine, by a reasonable certainty, Mock's future lost wages. See *Seaboard Coast-*

*line R. Co. v. Delahunt,* 179 Ga. App. 647, 651 (12) (347 SE2d 627) (1986).

11. In its final enumeration of error, Central contends the trial court erred in denying its motion for new trial based on the excessiveness of the jury's verdict. We disagree.

A detailed examination of the evidence bearing on damages in this case does not demand a finding that the jury's $755,000 general damage award was "so excessive as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial." (Citations and punctuation omitted.) *Norfolk Southern R. Co. v. Jones,* 219 Ga. App. 602, 608 (4) (466 SE2d 260) (1995). "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear exorbitant, flagrantly outrageous, and extravagant. It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush. It must carry its death warrant upon its face." (Citations and punctuation omitted.) Id. at (4) (a).

There was evidence that Mock suffered and is still suffering pain; he had three surgeries related to this incident; his job as an engineer sometimes aggravates his pain and he finds other ways to do his work when his left arm hurts too much; he misses approximately two trips a month because his left arm hurts and he needs to rest it from all the activities; and playing with his children causes him pain. Mock is permanently restricted from performing certain movements and suffers from a 24 percent permanent physical impairment of his whole person. In addition, Mock lost 16.5 years of seniority because of the injuries sustained. The jury also heard evidence from which it could have calculated Mock's special damages alone to total nearly $323,000. Accordingly, we cannot say that the jury's award of $755,000 is excessive and can be explained logically only as having resulted from an improper cause.

*Judgment affirmed. Birdsong, P. J., and Smith, J., concur.*

DECIDED MARCH 10, 1998 —
RECONSIDERATION DENIED MARCH 25, 1998 ▇▇▇▇▇

*Hall, Bloch, Garland & Meyer, F. Kennedy Hall, Todd C. Brooks,* for appellant.

*Burge & Wettermark, F. Tucker Burge, Groover & Childs, Frank H. Childs, Jr.,* for appellee.