S90G0484. CENTRAL OF GEORGIA RAILROAD COMPANY v. SWINDLE.

(398 SE2d 365)

FLETCHER, Justice.

This case, *Central of Ga. R. Co. v. Swindle*, 194 Ga. App. 24 (389 SE2d 779) (1989), is here on certiorari. The jury awarded plaintiff-appellee $875,000 in his action against his employer railroad under the Federal Employers' Liability Act (FELA). 45 USCA § 51 et seq. The question on certiorari is whether the verdict is either excessive or punitive.

Plaintiff is employed by defendant-appellant as a computer operator. On February 24, 1985, he slipped and fell in a bathroom on company premises, injuring his right shoulder. Initially, he did not think that the injury was serious enough to warrant filling out an accident report. A company physician subsequently diagnosed plaintiff as having muscle spasms in the right lumbar and lower thoracic regions, as well as tenderness over the joint of the right shoulder.

Plaintiff began treatment at an orthopedic clinic on April 25, 1985. He initially complained of pain in his right shoulder. He later complained of limited movement in his shoulder, as well as pain in his neck. He was initially diagnosed as suffering from an "impingement syndrome," which is an irritation and scarring of the coracoacrominal ligament and the rotator cuff. Later diagnoses included bursitis; "cervical spondylosis," which is loss in the height of the vertebra caused by trauma to the spine; possibly a "discogenic syndrome," which is pain emanating from the intervertebral disk; and a ruptured or slipped disk. Anti-inflammatory medications and physical therapy were prescribed.

To relieve plaintiff's complaints of shoulder pain, in 1985 three surgical procedures were performed: one outpatient procedure, one arthroscopic procedure requiring overnight hospitalization, and one procedure requiring two nights of hospitalization. Surgery was performed in August of 1986 for the disk problem which had caused, among other things, neck pain. Arthroscopic surgery requiring overnight hospitalization was again performed in March of 1988 for shoulder complaints.

At one point in plaintiff's treatment, his physician became concerned that plaintiff was suffering from a psychological disorder known as "chronic pain syndrome." The concern was based upon the absence of any objective basis for his pain and plaintiff was prescribed anti-depressants.

All physicians treating plaintiff testified that, although he will continue to be bothered by some neck and shoulder pain, his pain will diminish as he learns to avoid repetitive over-the-head movement of his arm in the course of doing such things as lifting objects. The phy-

sician performing the last surgery did not envision the need for any further surgery.

Plaintiff's hobbies include hunting, fishing, homebuilding, and playing baseball and football with his sons. He has had to restrict these activities. Plaintiff's wife testified that this has caused plaintiff to become grouchy and depressed. When asked whether plaintiff would have difficulty fishing, one of the physicians responded, "Overhead casting, yes."

Plaintiff's total special damages consisted of $32,218.82 in medical expenses and $27,090 in lost income.

We reverse the judgment of the Court of Appeals. After consideration of the record in this case, we are led to the conclusion that the jury intended at least a portion of the verdict to have the effect of punishing the defendant and influencing its conduct rather than compensating the plaintiff for his injuries. In FELA cases, this is impermissible.

Damages recoverable in an FELA action are compensatory only. *Seaboard System Railroad v. Taylor*, 176 Ga. App. 847 (2) (338 SE2d 23) (1985). The FELA plaintiff can recover special damages for past and future lost wages and medical expenses, as well as general damages for pain and suffering. See, e.g., *CSX Transp. v. Darling*, 189 Ga. App. 719 (377 SE2d 217) (1988); *Nairn v. Nat. R. Passenger Corp.*, 837 F2d 565 (2nd Cir. 1988). In arriving at its verdict, the jury should take into consideration the plaintiff's occupational disability and its impairment on his earning power. *Dugas v. Kansas City S. R. Lines*, 473 F2d 821, 827 (5th Cir. 1973). However, punitive damages are not allowable. *Seaboard System Railroad v. Taylor*, supra.

Federal courts have held that in determining whether a trial court abuses its discretion in refusing to order a new trial on the issue of damages in an FELA case, "the appellate court must make its own 'detailed appraisal of the evidence bearing on damages.' *Grunenthal v. Long Island Rail Road Co.*, 393 U. S. 156, 159 (89 SC 331, 333, 21 LE2d 309) (1968)." *Nairn v. Nat. R. Passenger Corp.*, supra, 837 F2d at 567.

The jury's determination of the amount of damages to be awarded in an FELA case has been held to be "otherwise inviolate, 'absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or *another improper cause invaded the trial.*' " (Emphasis supplied.) *Seaboard System Railroad v. Taylor*, 176 Ga. App. at 849, supra, citing *Lane v. Gorman*, 347 F2d 332, 335 (10th Cir. 1965).

Consistent with these holdings, we find the jury verdict in this case to be a verdict that can only be logically explained as having resulted from a punitive cause, which is an improper cause in FELA cases.

The evidence in this case shows that, although the plaintiff has undoubtedly sustained painful physical injuries which have required him to undergo extensive medical treatment, no occupational disability has resulted. He continues working in an office in the employ of the defendant railroad, and there is no evidence that his pay scale is less than it was before the accident. We find no evidence of any projected dollar amount of future medical expenses or future lost wages.

"[A] detailed appraisal of the evidence bearing on damages," *Grunenthal*, 393 U. S. at 159, supra, leads us to believe that the verdict here "raise[s] an irresistible inference that . . . [an] improper cause invaded the trial." *Seaboard System Railroad v. Taylor*, 176 Ga. App. at 849, supra. The defendant filed a motion in limine requesting that the plaintiff be barred from making "[a]ny suggestion that damages should be awarded in this case for the purpose of punishing the defendant or for the purpose of setting an example in order to influence conduct in the future." Recognizing that references to such matters are irrelevant in an FELA case and are also highly prejudicial, the trial court granted the motion.

Notwithstanding the ruling of the trial court on the motion in limine, a review of the transcript shows a pervasive and persistent attempt on the part of the plaintiff to establish improper motive and anti-union sentiment on the part of the defendant railroad, "suggesting that damages be awarded . . . for the purpose of punishing the defendant." Based upon our "detailed appraisal of the evidence bearing on damages," we can only conclude that this "improper cause" permeated the trial and resulted in the jury's rendering a verdict based, at least in part, on punitive damages.[1]

---

[1] Our conclusion in this regard is supported by the pejorative nature of plaintiff's closing argument, excerpted as follows:

"Why go into the fact that [railroad personnel] call up doctors? Well, I'll have to be honest with you now, folks, there's two reasons. Maybe you think one of them is illegitimate. . . . The very idea of presuming the right to call up this man's, or any other employee's doctor and discuss with him, without telling Bill, without permission, without a release, without nothing, discussing his medical condition, bothers me. It really does. It shows an attitude I think maybe is troublesome. And what did they call the doctors about? Did they really call them because they're interested in Bill's condition? What did Tom Barton ask about? When can he come back to work and what's the disability rating going to be. What's he worried about? He wants to talk to the doctor about the claim. Ladies and gentlemen, I suggest to you that what we need from the railroad is less suspicion and more safety."

"Face-to-face, they never questioned Bill; behind his back they mounted this investigation. Analogy to a child: behind-the-back investigations; calling his doctors. Haven't we come further than that in this society in this day and time? Haven't we come further than that now? Is that any way to treat an employee?"

"Maybe it's all right to do an investigation of somebody like this without ever telling him face-to-face you think he's lying, and then to hide the file. Maybe it's all right to keep a file on his union activities under his name. Why keep a record of how many of these claims he wins for his fellow employees under his name? I don't understand that."

"You're going to say something about how to treat employees."

We therefore remand the case for a new trial.

*Judgment reversed and case remanded. All the Justices concur, except Smith, P. J., and Benham, J., who dissent.*

BENHAM, Justice, dissenting.

The majority's opinion, though dispassionately phrased, is at bottom emotional, stating in essence that "the plaintiff received too much money; therefore, something must have gone wrong." I seek not to be guided by emotions but by well-established and time-honored principles of law, the most important one in this context being expressed as follows:

> "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear 'exorbitant,' 'flagrantly outrageous,' and 'extravagant.' 'It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush.' It must carry its death warrant upon its face." [Cits.] [*Seaboard System Railroad v. Taylor*, 176 Ga. App. 847, 849 (2) (338 SE2d 23) (1985).]

Since I believe this verdict is neither "monstrous," nor that it "carr[ies] its death warrant upon its face," I must respectfully dissent and offer the following reasons.

1. Cases of this type are fact-sensitive, and on appeal we must view the evidence in a light most favorable to the prevailing party. *Pendley v. Pendley*, 251 Ga. 30 (1) (302 SE2d 554) (1983). The jury was authorized to find that appellee was injured during the course of his employment and that his injuries were caused by his employer's

---

"Why don't they have somebody sitting over there who's going to pay attention to what you say in this case with your verdict."

"Compare him to the railroad. I'll submit to you that the railroad does have a peculiar mentality. How do they repay Bill Swindle's hard work and loyalty? . . . Has the railroad been fair to Bill Swindle? Has the railroad been fair to you? . . . [W]e ask that when you're deciding what to do, that you're not so fair to the railroad that you encourage their peculiar mentality. We ask that you not be so fair that you encourage their misplaced priorities. We ask that you not be so fair to the railroad that you encourage this kind of treatment of the employees."

"[W]hy would they go to such extremes with these efforts to prove it happened off the premises; why would they do that? Why did they keep a union file in his name? . . . I asked Mr. Gardner, 'What happens if you had proved it happened off the property?' Because that would mean Bill Swindle had filed a false accident report. You remember I asked Bill what happened to employees that filed false accident reports? They get fired. I suspect that explains a lot of what has gone on with Bill Swindle's injury. He's chairman of the [T]CU, he's got a file that keeps track of how many times he represents his fellow employees and makes the railroad pay them money. What kind of future does this man have at this railroad?"

negligence. The jury was further authorized to find that appellee suffered an injury to his back, neck and shoulders that required surgical procedures to his shoulder on two occasions and to his neck on one occasion; a myelogram; a diskogram; three electromyelograms; three cortisone injections; a score or more of physical therapy treatments; and over 50 visits to the doctor. One of the surgical procedures involved an incision in the front of appellee's neck so that a disk could be removed from the cervical area of his spinal column. That procedure was followed by the removal of bone from his hip to use in fusing his cervical spine. These medical procedures cost over $32,218.82 and resulted in appellee losing $27,090 in wages during his absence from work over 258 days.

The jury was also authorized to find that appellee endured protracted pain and suffering and that the pain and suffering will continue for an unknown amount of time; that appellee must rely on regular medication in order to function; that he will develop degenerative changes in his spine; that he has suffered a change in personality; that he will be limited in his activities both at work and away from work; and that he will require medical treatment in the future.

The jury in its wisdom awarded appellee $875,000 for his injuries, medical expenses, lost wages and pain and suffering. I submit that, under the evidence in this case, that award is within the range of the evidence and the enlightened conscience of the jury.

In *CSX Transp. v. Darling*, 189 Ga. App. 719 (377 SE2d 217) (1988), a case strikingly similar to the present case, the Court of Appeals considered the issue of excessiveness and decided, with only one judge dissenting, that the award of a jury should not be disturbed because the requirements hereinabove mentioned were not met. I contend that if the verdict in this case is wrong, then the verdict in *Darling* was wrong. However, since this court denied the petition for certiorari in *Darling*, it must have felt that *Darling* was right.

2. The majority opinion also concludes that appellee's counsel improperly argued for and received punitive damages in violation of an order limiting appellee's closing remarks. However, not only was there no objection to the argument, but no curative instructions were requested by appellant. In cases too numerous to mention, we have repeatedly held that " '[a] party cannot during the trial ignore what he thinks to be an injustice, taking his chance on a favorable verdict, and complain later. [Cits.]' " *Bolden v. Carroll*, 239 Ga. 188 (1) (236 SE2d 270) (1977).

In addition, we must observe that appellant filed a motion for new trial which was argued vigorously by appellant and then denied by the trial judge who heard the evidence, saw the witnesses and heard the closing argument. Furthermore, another appellate court has performed its duty to make a detailed appraisal of the evidence bear-

ing on damages. The majority, in effect, is second-guessing 12 jurors, one trial court judge, and another appellate court.

Believing the position taken by the majority will visit harm of an enormous magnitude on well-established and time-honored principles of law, I must dissent to an opinion which amounts to a judicial windshear that will be sudden in its onset and devastating in its result.

I am authorized to state that Presiding Justice Smith joins in this dissent.

DECIDED DECEMBER 4, 1990 —
RECONSIDERATION DENIED DECEMBER 20, 1990.

*Hatcher, Stubbs, Land, Hollis & Rothschild, Richard Y. Bradley, Robert C. Martin, Jr.*, for appellant.

*Butler, Wooten, Overby & Cheeley, James E. Butler, Jr., C. Frederick Overby*, for appellee.