### A03A0024. NORFOLK SOUTHERN RAILWAY COMPANY v. BLACKMON.
(585 SE2d 194)

SMITH, Chief Judge.

Mark Blackmon was injured when his specially equipped rail maintenance truck ran into the rear of a stopped train. He brought this action against his employer, Norfolk Southern Railway Company (NSRC), under the Federal Employers' Liability Act (FELA), 45 USC § 51 et seq. The jury awarded $5,000,000 to Blackmon, and NSRC appeals, arguing among other things that the trial court erroneously denied its motions for new trial, directed verdict, and judgment notwithstanding the verdict. Because we conclude that the jury's award was excessive and motivated by an improper punitive motive, we reverse.

Blackmon was an assistant track supervisor for NSRC. On February 26, 1998, Blackmon was driving a truck equipped with special wheels so that it could be driven along railroad tracks, performing a track inspection with a co-worker. He was driving approximately 30 mph along the tracks and was injured when the truck crashed into the rear of a stopped NSRC train. Blackmon's co-worker testified that he looked up and saw the train when it was approximately 150 feet away. He called out to Blackmon, who was unable to stop the truck before it hit the train. Blackmon testified that vegetation interfered with his ability to look ahead for safety purposes. He missed several weeks of work following the accident but returned April 15, 1998, after being medically cleared. Fourteen months later, however, he was removed from service for sleep-related problems.

Blackmon, who was 39 years old at the time of the collision, lost consciousness. He suffered a broken sternum, and the impact of the collision caused the emblem on the steering wheel of his vehicle to become imprinted on his chest. Blackmon presented evidence that he began having migraine headaches as a result of the collision.

Although the severity of the migraines decreased over time, he testified that he nevertheless continues to have "bad headaches." Blackmon also injured his back and suffers from herniated disks. He was given more than 300 pain injections for his back injuries and needed approximately 100 more at the time of trial. Because Blackmon was unenthusiastic about surgery to relieve his back pain, his pain was treated through medication and physical therapy. He also injured his knee, and he suffers from myofascial pain, which, he argues, cannot be surgically cured.[1] Blackmon testified at trial that he was taking a number of daily medications to manage his pain, including hydrocodone 10, Soma, Zanaflex, and Naprosyn. He also presented evidence that he suffers from Type II diabetes and that this condition was caused by his inability to exercise after the collision.

Evidence was also presented that as a result of his injury, Blackmon suffered from "moderate to severe obstructive sleep apnea," a disorder causing him to experience repeated upper airway closures as he sleeps. Dr. Alan Lankford, the health care professional who diagnosed this condition, concluded that Blackmon was "pathologically sleepy." He testified that Blackmon's pain medications had the potential to make him sleepy and that he was faced with the choice of taking the medication and experiencing daytime sleepiness, or not taking the medication and being unable to sleep due to his pain. Dr. Lankford further testified that Blackmon's sleep disorder prevented him from performing "an honest day's work" and that this condition would continue for the rest of his life.

Blackmon's relationship with his family suffered somewhat as a result of his injury. His wife testified that although their marriage was "good" after the collision, it was also "tensioned." She stated that before the collision, Blackmon was a good provider and was "fun" and "outgoing" but that after he was injured, Blackmon was emotional and irritable. His son testified that Blackmon could no longer camp and fish with him and that Blackmon is easily angered, while before the accident, he was "laid back" and "calm." Evidence was also presented that Blackmon suffered significant depression and anxiety due to the accident. His treating psychologist testified that although he had made some improvement after two years of psychotherapy, "he clearly has a good way to go."

Blackmon brought this action against NSRC, alleging that NSRC failed to provide a safe place to work and that NSRC violated federal safety regulations. The case went to trial, and Blackmon

---

[1] One physician testified that "myofascial generally indicates changes within the muscle tissue itself where areas of the muscle become contracted into what we call trigger points. Those trigger points are painful and tend to cause more muscle spasms in a self-perpetuating cycle."

sought $1,144,411 in lost wages and $2,000,000 for pain and suffering, for a total requested amount of $3,144,411. The jury completed special interrogatories, finding that Blackmon was 50 percent negligent and awarding him $5,000,000.

1. NSRC argues that the jury's $5,000,000 judgment in Blackmon's favor was "unsupported by evidence and grossly excessive" and that the trial court therefore erred in denying its motion for new trial. In addressing this contention, we are guided by certain axiomatic principles concerning damages in FELA cases. A plaintiff in this type of case can recover general damages for pain and suffering and special damages for both past and future lost wages and medical expenses. *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685, 686 (398 SE2d 365) (1990). An award of punitive damages, however, is not permitted. Id. We must also bear in mind the principle that the jury's determination of damages in this type of case is "otherwise inviolate, absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial." (Citations, punctuation and emphasis omitted.) Id. This standard is consistent with the standard of review for damage awards in non-FELA cases. In such cases, before a verdict will be set aside as excessive, if no direct proof of prejudice exists, the amount of the verdict, "when considered in connection with all the facts, must shock the moral sense, appear exhorbitant [sic], flagrantly outrageous, and extravagant. It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush. It must carry its death warrant upon its face." (Citations and punctuation omitted.) *Seaboard System Railroad v. Taylor*, 176 Ga. App. 847, 849 (2) (338 SE2d 23) (1985).

This standard for disturbing a jury's verdict in a case brought under FELA is clearly a stringent one. Nevertheless, in determining whether a FELA damage award was excessive, an appellate court is charged with the duty of making "its own detailed appraisal of the evidence bearing on damages." (Citations and punctuation omitted.) *Swindle*, supra, 260 Ga. at 686. If, as a result of that "appraisal," the appellate court determines that a jury's award is punitive in nature, the award must be reversed. Id. In *Swindle*, the plaintiff injured his shoulder and underwent three surgeries. Id. at 685. He had special damages of $32,218.82 in medical expenses and $27,090 in lost income, and the jury awarded him $875,000. Id. at 685-686. Citing extensively to the plaintiff's closing argument, the Supreme Court of Georgia found that the trial transcript demonstrated "a pervasive and persistent attempt on the part of the plaintiff to establish improper motive . . . on the part of the defendant railroad, suggesting that damages be awarded for the purpose of punishing the defendant." (Punctuation omitted.) Id. at 687. As a result of this find-

ing, the Supreme Court reversed the jury verdict, concluding that it was "based, at least in part, on punitive damages." (Footnote omitted.) Id.

The Supreme Court reached a similar conclusion in *CSX Transp. v. Levant*, 262 Ga. 313 (417 SE2d 320) (1992), a case in which the jury awarded the FELA plaintiff $56,000 more than his counsel requested, for a total verdict of $1,000,000. The plaintiff in that case established lost wages of $46,342.97 and medical expenses of $11,694.79. Id. at 314. In reversing this court's affirmance of the award on the ground that the verdict was a punitive one, the Supreme Court quoted directly from the dissent in *CSX Transp. v. Levant*, 200 Ga. App. 856 (410 SE2d 299) (1991), which catalogued portions of Levant's closing argument and which stated in part:

> Viewing excerpts of Levant's closing argument, it is apparent that in addition to arguing for legitimate damages, Levant's counsel informed the jury that the railroad was maintaining its tracks with an inadequate number of people and would continue to do so unless the jury made them pay; that the railroad did not care about Levant; that the jury should do right by Levant whom counsel considered to be a good man and his friend; and that the jury should stamp out those (the corporate appellant) who would try to have the jury not give Levant an award of adequate damages because Levant is a labor man. Inherent within Levant's closing argument is the message that the big railroad needed to be punished for these transgressions. This is precisely the danger condemned in *Swindle* and which provided the primary support for the court's conclusion therein.

(Citation, punctuation and footnote omitted.) *CSX Transp. v. Levant*, supra, 262 Ga. at 314 (1). See also *Seaboard System Railroad*, supra, 176 Ga. App. at 850 ($250,000 award unreasonable and punitive in nature).

In this case, as in *Swindle* and *Levant*, after making our own "detailed appraisal of the evidence bearing on damages," *Swindle*, supra, 260 Ga. at 686, we conclude that the jury's verdict "can only be logically explained as having resulted from a punitive cause, which is an improper cause in FELA cases." (Punctuation omitted.) Id. The jury found that Blackmon himself was 50 percent negligent yet awarded him substantially more for pain and suffering than he requested during closing argument. These facts indicate that the jury inflated its award out of a desire to punish NSRC.

Additionally, although the quality of Blackmon's health and life undoubtedly deteriorated to some extent as a result of his injury, evi-

dence was also presented through the testimony of Blackmon's own witnesses that his condition had substantially improved at the time of trial. His sternum fracture had healed. He never underwent surgery, and one of his physicians testified that he had reached 75 percent improvement with regard to his myofascial pain. Evidence was also presented that Blackmon was capable of working in a clerical position within the railroad. In addition, he returned to school for additional training. At the time of trial, he had completed one semester and had done "quite well" according to his treating psychologist, earning a 3.7 grade point average. The psychologist believed Blackmon could be gainfully employed as long as he was not required to work on railroad tracks. These facts underscore Blackmon's ability to adapt to his disability and improve his economic situation. They therefore demonstrate that an award of compensatory damages alone could not have approached the figure awarded by the jury and that the jury's verdict was likely influenced by a desire to punish NSRC rather than to compensate Blackmon.

But finally, and most importantly, in reaching our conclusion that the jury's award was punitive in nature, we need not rely solely on the exorbitant jury award that greatly exceeded Blackmon's own request and evidence of Blackmon's improved condition. Like the closing arguments in *Swindle* and *Levant*, the closing argument in this case illuminates with great clarity the source of the jury's motivation. Blackmon's counsel argued that the railroad "set Mr. Blackmon up for failure" and made it impossible for Blackmon to comply with its rules. During his argument concerning damages, Blackmon's counsel focused on the railroad's attitude toward Blackmon *after* the collision and implored the jury to change NSRC's behavior. He argued, for example, that the jury could "stop that railroad from laughing at him. For four years, he's had to listen to this railroad tell him it's his fault." Counsel also argued that NSRC had "railroaded" Blackmon and that the jury had "the power to stop the freight train." He told the jury that NSRC hung Blackmon "out to dry" and that NSRC had a "hole in their rules." He further implored the jury to "fix" the rule by writing "a rule with a verdict that screams all the way to Norfolk Virginia." Counsel infected his closing argument with a plea to the jury to punish NSRC or to reach a verdict that would affect its conduct. Under *Swindle* and *Levant* and other well-settled authority that damages in FELA cases are compensatory only, Blackmon's counsel clearly exceeded the bounds of permissible argument.

Our "detailed appraisal" of this closing argument, the jury's findings of negligence, and its excessive award leads us to the inescapable conclusion that the verdict was not based solely on a desire to compensate Blackmon and make him as nearly whole as possible.

On the contrary, we must conclude "that the jury intended at least a portion of the verdict to have the effect of punishing the defendant and influencing its conduct rather than compensating the plaintiff for his injuries. In FELA cases, this is impermissible." *Swindle*, supra, 260 Ga. at 686. Based on our review of the record, rather than compensating Blackmon for his injuries, the desire to punish NSRC clearly was an "improper cause" that "permeated the trial and resulted in the jury's rendering a verdict based, at least in part, on punitive damages." Id. at 687. Because the jury's verdict was infected by a punitive cause, we must reverse the trial court's denial of NSRC's motion for a new trial and remand this case for a new trial.

2. NSRC argues that the trial court erred in denying its motion for j.n.o.v. made on the ground that it did not violate 49 CFR § 213.37 (c). That regulation provides that "[v]egetation on railroad property which is on or immediately adjacent to [the] roadbed shall be controlled so that it does not . . . [i]nterfere with railroad employees performing normal trackside duties." Id. NSRC contends that Blackmon failed to prove that the vegetation that obstructed his view was located "in the tracks or in the roadbed."

It is a well-established principle of law that when reviewing the denial of a motion for j.n.o.v., the question before an appellate court is not whether the jury's verdict was "merely authorized." (Citation and punctuation omitted.) *Pulte Home Corp. v. Woodland Nursery &c.*, 230 Ga. App. 455, 456 (2) (496 SE2d 546) (1998). Rather, the question "is whether a contrary judgment was demanded. A judgment n.o.v. is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion." (Citations and punctuation omitted.) Id.

Here, some evidence was presented from which the jury could determine that the vegetation that allegedly obstructed Blackmon's vision was located on the railroad's property and was immediately adjacent to the roadbed. He testified, for example, that the vegetation was "definitely adjacent to the track." Testimony from other NSRC employees likewise authorized the jury to conclude that the vegetation was immediately adjacent to the roadbed. A "contrary verdict" was not demanded under the facts of this case, and the trial court did not err in denying NSRC's motion for j.n.o.v.

3. NSRC also argues that "[b]ecause Blackmon's job was to inspect for hazards, NSRC cannot be held strictly liable for injuries associated with the inspection." We do not agree. The FELA "impose[s] upon the employer the duty of paying damages when injury to the worker is caused, in whole or in part, by the employer's

fault." *Kernan v. American Dredging Co.*, 355 U. S. 426, 432 (78 SC 394, 2 LE2d 382) (1958). Furthermore, the statute

> [p]rovide[s] the framework for determining liability for industrial accidents. But instead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injuries for injured employees in a manner analogous to the development of tort remedies at common law. *But it is clear that the general congressional intent was to provide liberal recovery for injured workers.*

(Citation omitted; emphasis supplied.) Id. 49 CFR § 213.37 (c) is written in unambiguous terms. It protects "railroad employees performing normal trackside duties." Id. Blackmon was a "railroad employee" who clearly was performing his "normal trackside duties" and therefore was an intended beneficiary of the regulation. Given the unambiguous language of the regulation and the liberal intent underlying the FELA, we cannot agree that a j.n.o.v. was authorized.

*Judgment reversed and case remanded. Ruffin, P. J., and Miller, J., concur.*

DECIDED JULY 10, 2003 — ▮▮▮▮▮▮

*Weissman, Nowack, Curry & Wilco, William C. Thompson, Steven D. Caley*, for appellant.

*Warshauer, Woodruff & Thomas, Michael J. Warshauer, Bradford W. Thomas*, for appellee.