**SECOND DIVISION**
**DOYLE, C. J.,**
**BRANCH and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 23, 2017**

# In the Court of Appeals of Georgia

A17A0274. CENTRAL OF GEORGIA RAILROAD COMPANY v. ROSS.

BRANCH, Judge.

Nathaniel Ross was employed as a conductor by Central of Georgia Railroad Company when, early in the morning on November 1, 2005, he fell and injured his right knee. Ross brought a suit for damages against Central under the Federal Employer's Liability Act ("FELA"), 45 USC § 51 et seq. Almost ten years later, the case was tried before a jury, which returned a verdict for Ross for $1,033,000 and assigned contributory negligence of 40% to Ross, resulting in a net verdict of $619,800 against Central. Central appeals, arguing that it was entitled to a judgment as a matter of law in that there was no evidence that it was negligent and that Ross's injury was caused solely by his own negligence. Central also asserts that the trial

court erred with regard to certain evidentiary rulings. For the reasons that follow, we affirm.

Construed in the light most favorable to Ross as the prevailing party, the evidence shows that at about 11:30 p.m. on October 31, 2005, Ross, a one-year employee of Central, reported to work for a job that involved switching cars at a terminal where he had worked more than twenty times before the incident. To perform this work, Ross and his colleagues were often located on a 10-foot wide gravel path or road that runs east and west and parallel to the six tracks in the rail yard. Near the location of Ross's work, drainage pipes run perpendicular to and under the tracks and road. These pipes empty out into an 11-foot wide, 42-inch deep drainage ditch located at the southern or non-track edge of the gravel road.

Photographs and testimony showed that at the time of the incident, grass and vegetation was overgrown on the east and west edges of the ditch, and that the 42-inch drop at the uneven edge of the road was not guarded by a railing, curb, or any other type of barrier or warning. There was also testimony that the ditch could not be seen without looking down right on top of the ditch itself but that it could have been seen if the vegetation had been cleared. Although there was lighting nearby, Central admits that there were no lights directly adjacent to the road and ditch where the

2

incident occurred. There was evidence that Central provided more extensive lighting at another rail yard. Workers carried lanterns after dark, which Central provided. Ross had seen the ditch during daylight hours on previous occasions but never reported it as a dangerous condition. But that night in the dark, Ross could not see the ditch due to the vegetation, which ran many yards in each direction away from the ditch, and consequently, he did not know where the ditch was located while he was working. Central had inspected the area for safety every month for 31 years, but it had never taken any precautionary measures to protect employees from the 42-inch drop at the edge of the gravel path.

Ross was injured at about 3:00 a.m., near the end of the job. As he was holding his lantern, Ross stood on the path facing a train that was slowly going by as part of an operation that involved uncoupling and recoupling certain cars to the train and switching cars to different tracks. While other employees were working nearby, Ross was on the radio giving his engineer instructions for the train movements and simultaneously keeping track of how many train cars passed until the train was in the necessary position to stop, which he planned to communicate to the engineer. The work required looking up and down the track at the progress of the train and monitoring other details of the operation. As the operation was almost over and as

3

Ross was looking at a distance around a curve trying to locate the last car on the train, Ross, without looking back, took a step backwards with his left foot and slid down into the ditch. Ross's right foot stayed on top of the bank and his right knee was injured as he fell.

Ross received some treatment in a hospital emergency room the day after the accident but did not immediately report his injury to Central as required by company rules. He informed Central on November 12. One month after the accident, he had arthroscopic surgery for a torn meniscus followed by physical therapy. By March 2006, he was approved to return to work as a railroad conductor. Ross continued as a full-time conductor from March 2006 through the autumn of 2006, and he was able to do his work until October 2006, when, as is more fully explained below, he was terminated by Central. His knee pain continued, however, and he had an MRI and a second surgery by a different doctor in May 2007, as well as other treatments. Ross thereafter received another evaluation that he could return to doing the job of a conductor. Nevertheless, despite surgery, physical therapy, and knee injections, Ross, in fact, could no longer perform repetitive squatting or ladder climbing as required for his job. He continues to have pain during heavy lifting and prolonged standing. Ross saw a third doctor in September 2008, but he has not had any additional surgery.

At the time of trial, he had been working for Wal-Mart in the pharmacy for about five years.

Dr. Fred Johnson, Ross's expert witness on economic damages, testified regarding Ross's wage-related damages from the date of injury to trial and from the trial going forward. For damages prior to trial, Johnson took Ross's earnings from the time of the injury in 2005 and, based on a similar Central employee, determined what Ross could have made working for Central though the date of trial, less what Ross actually made working for other employers, including Wal-Mart, and less any earned income credit he received on his taxes. Using this calculation, Johnson determined that Ross had lost income of $158,992 in the almost ten years since the injury.

For future income loss, Johnson calculated the net-present value of the difference between the after-tax income that Ross would have been receiving at the time of trial if he still worked for Central (so-called "railroad wages") and the after-tax income that Ross was receiving in his job at Wal-Mart, with both values extended over Ross's remaining work-life expectancy of approximately 15 years. Using this calculation, Johnson determined Ross's future income loss to be $236,416. Johnson also calculated Ross's future loss of benefits from Central as $233,859. The total of

these three calculations is $629,267. Other damage evidence not relevant to this appeal also was presented.

During trial and thereafter, Central argued in motions for directed verdict, for judgment notwithstanding the verdict, and for new trial, that it was entitled to a judgment as a matter of law on the ground that Ross failed to show any negligence on the part of Central. The trial court denied the motions. In denying Central's motion for new trial, the trial court found that some evidence was presented to show that Central "did not maintain a safe working place in the area of the ditch and should have known that this vegetation-covered ditch next to a walking path was a potential hazard" and that there was some evidence "that there was inadequate lighting at the location."

1. In its first enumeration, Central argues that the trial court erred in these rulings by not entering judgment in favor of Central as a matter of law. On appeal of these rulings, this Court must determine whether there is any evidence to support the jury's verdict. See *Ga. Power Co. v. Irvin*, 267 Ga. 760, 762 (1) (482 SE2d 362) (1997).

Under FELA, Central has "a duty to use reasonable care in furnishing its employees with a safe place to work." *Norfolk Southern R. Co. v. Zeagler*, 293 Ga.

6

582, 587 (2) (a) (748 SE2d 846) (2013) (citations omitted).[1] This duty requires the railroad "to exercise the care that a reasonable and prudent person would exercise under the same circumstances." Id. at 588 (2) (a) (citations and punctuation omitted)."The carrier is required to take precautions commensurate with danger inherent in the situation and to exercise ordinary care proportionate to the consequences that might be reasonably anticipated from neglect." *Hepner v. Southern R. Co.*, 182 Ga. App. 346, 347 (356 SE2d 30) (1987) (citations omitted). And "what particular action a railroad should take to address a given workplace hazard is a question of whether the railroad breached the standard of care," which is a question for the jury. *Zeigler*, 293 Ga. at 586, 589.

---

[1] As specifically provided in FELA,
Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 USC § 51.

The jury must also decide issues of causation, and under FELA, the normal rules of causation are relaxed:

> the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence.

*Rogers v. Missouri Pacific R. Co.*, 352 U. S. 500, 506-507 (77 SCt 443, 1 LE2d 493) (1957); see also *Zeagler*, 293 Ga. at 587 (2).

Here, there was some evidence from which a jury could conclude that Central breached its duty to keep the workplace safe and some evidence that the breach caused Ross's injury. The large, deep ditch was immediately adjacent to the work area, it was partially obscured by weeds and vegetation, it was not marked in any way as a hazardous area, it was not protected by a chain or rail of any sort, and the area was not well lit. Thus, some evidence was presented that Central failed to keep the workplace safe, and at least slight evidence was presented to show that Central's failure caused Ross's fall. See generally *Hepner*, 182 Ga. App. at 348, n. 1 ("Under [FELA], an employee could be negligent 99.99 percent and the employer only 00.01

8

percent negligent and the employee would still be entitled to recover in proportion.") (citations and punctuation omitted). The trial court therefore did not err in denying Central's motions for judgment as a matter of law on this ground.

2. In two enumerations of error, Central contends the trial court erred by allowing Ross to introduce evidence of railroad-scale wages and benefits in support of his claim for economic damages and by allowing Ross to introduce evidence that he had been disciplined unfairly and eventually terminated in retaliation for reporting the injury. We disagree and find that Ross was properly allowed to introduce railroad-scale wages and benefits as a part of his claim for lost earning capacity, and Central's own actions induced the introduction of Ross's version of why he was terminated.

Prior to trial, Central moved in limine to exclude evidence of railroad-scale wages and benefits given that Ross had been terminated one year after the accident for reasons allegedly unrelated to the accident. Central argued that under the circumstances, Ross should not be allowed to argue that he was entitled to railroad wages and benefits, which are supposedly higher than average, because his termination foreclosed any possibility that he would have continued to work for Central, or, presumably, for any railroad, until retirement if the injury had not occurred. Alternatively, Central argued that if Ross "is allowed to offer evidence of

railroad wages and benefits in support of his lost earnings claim, then [Central] . . . should be allowed to rebut that evidence with Plaintiff's complete disciplinary history to show that plaintiff was not well-suited for railroad work and would not likely have continued as a railroad employee if the incident had not occurred." Central argued that Ross's disciplinary history was relevant to show that his lost earning capacity was due to factors other than the injury.

At the hearing on these issues, the trial court ruled that it would allow Ross to present evidence of what he would have earned had he remained employed or employable by the railroad. The court also held that Ross's disciplinary record would be admissible, as requested by Central, to show that Ross was terminated for a reason unrelated to the injury but that Ross would therefore be allowed to rebut Central's premise by asking questions with a "good-faith basis" based on "competent evidence" as to whether Ross's dismissal was pretextual, i.e., whether Central terminated him because of his injury. At trial, the court clarified that all such evidence was "proper only to the extent that an argument can be made with regard to lost future earnings, whether or not he could have continued to work for the railroad and earn that money."

Consequently, evidence was presented to show that Ross's employment was marked by repeated rules violations and multiple incidents of discipline, and that he

was initially terminated within two months of the accident for several reasons including failing timely to report the accident at issue, making false and conflicting statements regarding the incident, and falsifying his claim of personal injury Central thereafter agreed to reinstate Ross and he returned to work in March 2006. But in October 2006, he was again terminated for allegedly violating other company rules and instructions and for mishandling several rail cars.[2] Finally, Ross presented some evidence suggesting that after he returned to work following his initial termination he was accused of falsifying his injury and was treated more harshly for minor work infractions.

The standard of review for the admission of evidence is well-established:

A trial court's ruling that evidence is relevant will not be reversed absent abuse of discretion. This is so because trial courts, unlike appellate courts, are familiar with a piece of litigation from its inception, hear first-hand the arguments of counsel, and consider disputed evidence

---

[2] Ross's termination was upheld by a public law board (PLB).
A PLB . . . is essentially an arbitral tribunal that reviews the outcome of a railroad's investigative hearing to ascertain whether the result is consonant with the terms of the [collective bargaining agreement] between the railroad and its union employees.

*Kulavic v. Chicago & Illinois Midland R. Co.*, 1 F3d 507, 513 (2) (7th Cir.1993).

11

within the context of an entire proceeding. Thus, as an appellate court we defer to the trial court with regard to the admission of evidence, unless the lower court's decision is so flawed as to constitute an abuse of discretion. Moreover, unless the potential for prejudice in the admission of evidence substantially outweighs its probative value, the Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value. Even evidence of doubtful relevancy should be admitted and its weight left to the jurors. And if evidence is competent for any purpose, its admission does not constitute error.

*Smith v. CSX Transp.*, 325 Ga. App. 314, 318 (751 SE2d 604) (2013) (citations and punctuation omitted).

(a) Central first argues that the trial court erred by allowing Ross to introduce evidence of railroad-scale wages and fringe benefits. Central asserts that it was undisputed that Ross was fired for reasons independent from his injury and that he therefore could never have returned to work for Central or any railroad, regardless of the condition of his knee. We hold that the trial court did not abuse its discretion by allowing Ross to introduce evidence of railroad wages and benefits.

"[A] FELA plaintiff can recover special damages for past and future lost wages and medical expenses, as well as general damages for pain and suffering." *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685, 686 (398 SE2d 365) (1990) (citations omitted);

12

see also *Chaffin v. Union Pacific R. Co.*, 192 Fed. Appx. 739, 748 (10th Cir. 2006) ("FELA entitles a claimant 'to the difference between what he was able to earn prior to his injury and what he . . . could have earned thereafter.") (citation and punctuation omitted); *Baker v. Baltimore & Ohio R. Co.*, 502 F2d 638, 644 (6th Cir. 1974) ("we start from the proposition that Appellee was entitled to recover for any loss of earning power suffered because of Appellant's negligence").

In proving these damages, FELA plaintiffs are authorized to introduce evidence of their railroad wages in connection with proving future earnings when relevant to show what they would have earned had they not been injured. For example, in *Hall v. Norfolk Southern R. Co.*, 829 F. Supp. 1571, 1582 (A) (4) (N.D. Ga. 1993), the railroad argued that the plaintiff could not recover lost railroad wages because he had been dismissed from the railroad shortly after the accident that caused his injuries. The district court noted that a FELA plaintiff is not allowed to present evidence of wages lost because of his dismissal from the railroad. Id. But where the plaintiff argues that "his injuries prevent him from holding a job like the one he held at the time of his injury," the plaintiff may use "his railroad earnings as a measure of his earning capacity at the time of the accident." Id. And in *Norfolk Southern R. Co. v. Schumpert*, 270 Ga. App. 782, 786 (2) (608 SE2d 236) (2004), this Court held that

a FELA plaintiff proving future earnings was authorized to "present[] evidence of the difference between what he was making with a new employer and what he would have made at [the railroad]" even though he had been "properly fired only eight months after the injury for violating company policies by never reporting the accident and by misrepresenting the reason he had missed work." Id.

Here, Ross argued that he was entitled to receive the wages that he otherwise would have received if he had not been injured; he was not seeking to recover wages lost as a result of his termination, and the trial court so instructed the jury. Therefore Ross was authorized to introduce evidence of railroad wages and benefits. Accordingly, we find no abuse of discretion in the trial court's ruling allowing Ross to introduce evidence as to so-called railroad wages. See *Hall*, 829 FSupp. at 1582 (plaintiff could seek lost railroad wages where he "did not seek to recover for wages lost due to his dismissal"); *Schumpert*, 270 Ga. App. at 786 (2) (injured FELA plaintiff properly allowed to introduce evidence of railroad wages even though he was properly fired eight months after the injury), cert. denied, 546 U. S. 1025 (126 SCt 663, 163 LE2d 543) (2005).

Central counters that a recent unpublished opinion from an Illinois appellate court holds otherwise:

14

> [W]here an unrelated condition, separate and apart from the injury that gave rise to the FELA claim, rendered a railroad employee unable to work in his prior position at the railroad, evidence of lost railroad wages beyond the point of the unrelated condition is not admissible to establish lost future earnings.

*Niemann v. Illinois Central R. Co.*, 2016 WL 283584 (Ill. App 2016), citing federal case law. As shown below, the federal cases upon which *Niemann* relies for this proposition, as well as another case cited by Central, do not support the conclusion that being fired from one railroad job renders an employee unable to work in his former position for another company.

The court in *Niemann* relied on *Harris v. Illinois Central R. Co.*, 58 F3d 1140 (6th Cir. 1995), and *Parra v. Atchison, Topeka & Santa Fe R. Co.*, 787 F2d 507, 508 (10th Cir. 1986). Central also relies on *Bonner v. Union Pacific R. Co.*, 2005 WL 1593635, at *2 (D. Idaho 2005). All three cases are distinguishable. In *Harris* and *Parra*, some time after the FELA plaintiff received the injury that prompted the FELA action, but before trial, the plaintiff developed an unrelated *medical condition* that rendered the plaintiff physically unable to perform work as a railroad employee. *Harris*, 58 F3d at 1142 (evidence showed that plaintiff had an enlarged heart, not related to the accident, that "would have left him unable to work as a carman. . . even

15

if there had been no accident"); *Parra*, 787 F.2d at 509 ("[I]t seems improper for plaintiff to be compensated for future wages from heavy labor for which his preexisting congenital back disorder had already disqualified him."). And in *Bonner*, the plaintiff was fired because three months after his alleged injury, he was apprehended by police for surreptitiously video-taping two women without clothing through a window at their home at night and lied to the police, claiming that he was videotaping on behalf of his employer in an effort to discredit a fellow employee; the plaintiff also admitted that "he can no longer work for Union Pacific due to a permanent disability unrelated to his termination and his present injuries." *Bonner*, 2005 WL 1593635 at *2 (plaintiff also presented no evidence to support calculation of lost potential earnings).

Thus, in two cases, the plaintiff was terminated for a medical condition that would have prevented the plaintiff from working in the railroad industry regardless of the FELA injury. And in the third case, the plaintiff was terminated for criminal behavior, he admitted that he had an unrelated permanent disability, and he failed to present any evidence at all to support a claim of lost potential earnings. Unlike the court in *Niemann*, we find no reason to extend the rule from these cases to one where the FELA plaintiff was terminated for work-related reasons. In this case, although

16

Central was authorized to argue that Ross did not have good work habits or occupational abilities and that therefore his future earning potential might not be as good as suggested by Ross's expert witness, see *Smith*, 325 Ga. App. at 319, there is no undisputed evidence that Ross could not have been hired by another railroad after being fired by Central.

(b) Central also contends that the trial court erred by allowing Ross to introduce evidence that he had been disciplined unfairly and eventually terminated in retaliation for reporting the injury. We find that Central induced any possible error when it asked the court to allow it to introduce evidence of Ross's disciplinary record in connection with Ross's attempt to introduce evidence of railroad wages. See *Dyals v. Dyals*, 281 Ga. 894, 896 (3) (644 SE2d 138) (2007) (appellant "cannot complain of error induced by his conduct" (citation and punctuation omitted)). Central specifically argued that if Ross was allowed to offer evidence of railroad wages and benefits in support of his lost earnings claim, "then [Central] . . . should be allowed to rebut that evidence with Plaintiff's complete disciplinary history to show that plaintiff was not well-suited for railroad work and would not likely have continued as a railroad employee if the incident had not occurred." After granting Central's

request, the court did not abuse its discretion by allowing Ross to introduce evidence contrary to Central's evidence.[3]

3. Finally, Central contends that a new trial is required because Ross repeatedly claimed poverty during the trial.

Prior to trial, Ross moved in limine to bar evidence of any financial impact a verdict would have on Central. Central agreed so long as the bar applied to both parties, and the trial court held in limine that the financial status of both parties was irrelevant and inadmissible. Central contends that Ross and his counsel violated the court's order in the following ways. During his opening statement, Ross's counsel stated:

> Now, Mr. Ross, he has children. . . . And when his daughter comes to him and says, dad, can't you get a different job. Dad, can't I have some money to go . . . to SCAD, where she's presently in school. [Ross] has to say, I'm on the couch. I'm doing the best I can.

Ross testified similarly:

---

[3] Although Central induced the court to admit evidence of Ross's termination, the trial court instructed the jury that the case did not include a claim arising from Ross's termination of employment and that the jury should not consider evidence regarding disciplinary issues with respect to an award of damages but only as to how termination of employment might bear on the calculation of lost earnings.

18

Q: And where have you been working in jobs since this injury?

A: Well, . . . I got three kids and they constantly wanting stuff. My daughter, you know, when I go and tell her she can't have something, she don't understand it. You know, she's like, you need to get another job, and I'm like, I can't. So I try to explain that to her.

And during closing argument, Ross's counsel stated:

Let's talk about mental anguish. . . . Come with me as my right leg is stretched out because that's the best I can do after eight days on my feet at Wal-Mart. And come with me as my son comes into the room, and I'm sitting on the green couch, and he says dad, can you teach me to play soccer. . . . Come with me when my daughter comes and asks for the things that daughters ask for. And says, dad, can I have some money for a dress. Dad, can I have some money for education. Dad, I really want that new purse. And my dad's heart, which wants to give, has to say no. Because my knee won't let me get a better job and because at the end of the workday, this is the best I can do. [4]

In its order denying Central's motion for new trial, the trial court stated that it "precluded evidence of financial circumstances based on financial sympathy or

---

[4] Central did not object following any the three statements, but "[h]aving obtained a ruling in limine excluding such evidence, it was not necessary for appellant to raise an objection at trial when the evidence was introduced in order to preserve this issue for appellate review." *Lewis v. State*, 279 Ga. 69, 73 (608 SE2d 602) (2005).

impact. In contrast, [Ross's] testimony described the mental stress that he endured in connection with his relationship with his children and his employment status." The court concluded that Ross's mental suffering resulting from the injury was relevant to the case and that the court could not conclude that the challenged statements were only offered to gain sympathy. Our review is for abuse of discretion, see *Postell v. Hankla*, 317 Ga. App. 86, 90 (2) (728 SE2d 886) (2012); *Kane v. Cohen*, 182 Ga. App. 485, 487 (2) (356 SE2d 94) (1987), and we find none.

"The general rule is that evidence of the wealth or worldly circumstances of a party litigant is never admissible, except in those cases where position or wealth is necessarily involved." *Bailey v. Edmundson*, 280 Ga. 528, 534 (6) (630 SE2d 396) (2006) (citations omitted). On the other hand, "[e]ven if the plaintiff should produce no evidence from which a jury could determine a pecuniary value for loss of his earning capacity, the courts have approved of including damages for decreased ability to labor as an element of pain and suffering to be measured by the enlightened conscience of the impartial jurors in such a case." *Nat. Upholstery Co. v. Padgett*, 108 Ga. App. 857, 860 (1) (134 SE2d 856) (1964) (citations omitted); see also *Gilbert v. Parks*, 140 Ga. App. 550 (1) (b) (231 SE2d 391) (1976) (it is not "error to charge that the loss or impairment of ability to work may cause grief, distress or worry and may

20

be considered by the jury in determining damages for pain and suffering"). For example, our Supreme Court has affirmed that a "plaintiff's mental distress resulting from his inability to care for his invalid wife and to care for and play with his five children, caused by or growing out of his bodily injury, was a proper element of damage—pain and suffering." *Underwood v. Atlanta & W. P. R. Co.*, 105 Ga. App. 340, 351 (124 SE2d 758) (1962), rev'd in part on other grounds, 218 Ga. 193 (1) (126 SE2d 785) (1962). Compare *Warren v. Ballard*, 266 Ga. 408, 410 (2) (467 SE2d 891) (1996) ("anxiety, agony, or worry over the payment of medical bills" is not a proper element of damages). And "evidence inadmissible for one purpose may be relevant and admissible for another purpose." *Shivers v. Webster*, 224 Ga. App. 254, 256 (1) (480 SE2d 304) (1997) (citation omitted).

Here, testimony had already been admitted showing that sometime after his injury, Ross had taken a job that paid significantly less than he had been receiving at the railroad. Then, in the testimony at issue in this enumeration, Ross testified to the pain and suffering arising from his injury associated with his relationship with his children, including having to listen to his daughter's questions about why he could not get a better job or pay for more things. This evidence of grief and distress was admissible as an element of Ross's claim for pain and suffering. We therefore

21

conclude that the trial court did not abuse its discretion in determining that the challenged testimony was relevant to Ross's claim for pain and suffering.

For the reasons stated above, we affirm.

*Judgment affirmed. Doyle, C. J., and Reese, J., concur*.